Ms. Carole Kessler, Manager Arkansas Racing Commission 101 E. Capitol, Suite 114 P.O. Box 3076 Little Rock, Arkansas 72203
Dear Ms. Kessler:
This is in response to your request for an opinion on whether the Arkansas Racing Commission may lawfully authorize an additional form of "pari-mutuel wagering" under existing law. You note that:
 Presently, patrons at Oaklawn Jockey Club in Hot Springs may place wagers at self service stand alone terminals on live horse racing conducted at Oaklawn Park in Hot Springs, as well as on races simulcast to Oaklawn Park from other racetracks. The Arkansas Racing Commission desires to adopt rules and regulations to allow Oaklawn to also conduct pari-mutuel wagering on actual races that previously have been run at sometime in the past whereby its patrons may wager on and watch such races at self service stand alone terminals on the grounds of Oaklawn's licensed racetrack facility in Hot Springs under procedures that protect the anonymity of the race and actual participants in the race until after the patron has placed a wager and made his or her wagering selection in the race.
You state that it is the opinion of the Racing Commission that it may lawfully authorize such additional pari-mutuel wagering under existing law, and the Commission seeks my opinion confirming the understanding of the Racing Commission on this issue.
To further elaborate on the "additional pari-mutuel wagering" contemplated, you state that:
 As noted above, the races would be real races that have been run at racetracks at sometime in the past. Prior to the time the patron makes his or her pick in the race, the patron would have access at the terminal to certain past performance information regarding the actual horses and/or jockeys in the race to be shown, such as actual race records and prior earnings, or some other form of past performance data to assist the patron in making his or her wagering selection in the race. However, the real name of the horses and jockeys will not be utilized, and the exact identity of the race to be shown and name of the racetrack where the race ran live will not be revealed until after the patron has placed a wager and made his or her choice in the race. After the patron places the wager and makes his or her wagering pick in the race, the identity of the race and racetrack where the race actually ran live will be shown to the patron on a video screen at the terminal, along with a video replay of all or part of the race.
 All wagers with respect to separate types of bets (win, exacta, trifecta, etc.) will be placed in separate pari-mutuel wagering pools, and the amounts remaining in each pool, after reduction for the appropriate track takeout and state taxes under applicable law and rules and regulations of the Racing Commission, will be returned to the patron who first selects the winner or winning combination in the particular wagering pool. No form of wagering other than pari-mutuel wagering will be authorized.
RESPONSE
Your question is whether the Arkansas Racing Commission, under existing law, may legally authorize the additional form of "pari-mutuel" wagering described above. Your question is drafted very broadly and may encompass the necessary resolution of a number of separate issues. These issues include, but are not limited to: 1) whether the described activity is "horse racing" as contemplated in the relevant legal provisions; 2) whether the conduct you describe is indeed "pari-mutuel" in nature; 3) whether the activity is prohibited as constituting a "lottery" under provisions of the Arkansas Constitution, which necessarily involves an inquiry into whether the activity includes the use of skill or whether it is controlled by "chance alone."
Although my office has undertaken exhaustive efforts to analyze and address the legal issues noted above, I am forestalled from reaching any ultimate legal conclusions in this regard due to the inherently factual nature of the inquiry underlying the legal analysis. The ultimate resolution of the issues above will require the finding of facts. I have stated, as have my predecessors, on occasions too numerous to cite, that in issuing Attorney General opinions the Attorney General is not empowered as a fact-finder. I have no authority to take evidence or resolve disputed issues of fact, such as determining the exact features of the activity you describe, including whether it qualifies as the conducting of "horse racing," whether the system of betting thereon is "pari-mutuel," or whether there is skill involved in the activity. In short, these questions are in large degree ones of fact that cannot be resolved in the format of an Attorney General's opinion.
Factual considerations will play a particularly prominent role in resolving the question regarding the existence of a "lottery" for purposes of the Arkansas Constitution and in determining the "pari-mutuel" nature of the activity.
The Arkansas Constitution, art. 19, § 14 prohibits lotteries. ("No lottery shall be authorized by this State, nor shall the sale of lottery tickets be allowed.") A "lottery" is defined as "a species of gaming, which may be defined as a scheme for the distribution of prizes by chance among persons who have paid, or agreed to pay, a valuable consideration for the chance to win a prize." Burks v. Harris, 91 Ark. 205,120 S.W.2d 979 (1909). A lottery is a type of gambling, but not all types of gambling are lotteries. Thus, "lotteries" are prohibited by theconstitution. Other types of gambling may be and are prohibited by thelegislature. See e.g., A.C.A. § 5-66-101 to -119 (1987). The legislature is free, however, if it chooses, to authorize various forms of "gambling." The legislature may not, however, authorize a "lottery," which is prohibited by the Arkansas Constitution. It has been stated that in order to constitute a "lottery," it is essential that the winners be determined by "chance alone," and that the outcome be "wholly dependent upon the element of chance," and the type of betting be "completely controlled by chance." Scott v. Dunaway, 228 Ark. 943, 311 S.W.2d 305
(1958), citing Longstreth v. Cook, 215 Ark. 72, 220 S.W.2d 433 (1949).
Horse racing, at least as traditionally conducted, has been held not to constitute a "lottery." Longstreth v. Cook, supra. The "additional pari-mutuel wagering" you describe, however, contains elements factually distinct from those analyzed in Longstreth. In short, a determination of relevant facts by the judicial branch will be necessary to definitively resolve the issue in this regard. See, e.g., Arkansas State RacingCommission v. Southland Racing Corp., 226 Ark. 995, 295 S.W.2d 617 (1956) (noting that the Longstreth decision was based upon a finding of fact rather than an abstract issue of law, and declining to resolve a similar issue without development of the factual issue); and Harris v. MissouriGaming Commission, 869 S.W.2d 58 (Mo. 1994) (remanding for factual determination as to whether certain "video slot machines" that replicate games of skill are prohibited lotteries).
Similarly, the "pari-mutuel" nature of the activity you describe must be determined with reference to all the facts surrounding the operation of the machines in question. Although you have outlined some facts describing the pari-mutuel nature of the activity, the ultimate determination of the question must be resolved with the exacting scrutiny and analysis that only an adversary judicial proceeding can provide.
It has been stated that: "Pari-mutuel betting, originally known as `Paris Mutuel,' is generally believed to have been devised by one d'Ollier in France about the middle of the nineteenth century. The system of calculations was first devised in early 1908 by Colonel Matt Winn and Judge Charles Price, and was introduced to the public at the Kentucky Derby of that year, and subsequently adopted and presently employed at every race track in the United States and Canada holding pari-mutuel betting." New York Jurisprudence (Second ed. 1999), IV Pari-MutuelBetting on Horse Races, §§ 26, citing Salmore v. Empire City RacingAss'n., 123 N.Y.S.2d 688 (Sup.Ct. 1953).
It has been stated that "pari-mutuel betting" is defined as "A mutual stake or wager; a betting pool. A form of betting on horses or dogs in which those who bet on winner share total stakes less a small percent to the management." Black's Law Dictionary, (5th Ed. 1979) at 1004, citingDonovan v. Eastern Racing Ass'n. 324 Mass. 393, 86 N.E.2d 903, 906 (19).See also, Greater Loretta Improvement Ass'n. v. State, 234 So.2d 665
(Fla. 1970); State v. Felton, 239 N.C. 575, 80 S.E.2d 625 (1954); Matsonv. Hollywood Turf Club, 101 Cal. App.2d 215, 225 P.2d 276 (1950); andCity of Portland v. Duntley, 185 Or. 365, 203 P.2d 640 (1949).
In summarizing the Arkansas Supreme Court's earlier opinion inLongstreth, the court in Scott v. Dunaway, supra, stated that: "We described in detail the pari-mutuel system, under which all the money wagered is initially divided into several pools, such as the win pool, place pool, show pool, daily double pool, etc., and, after deduction of a percentage for the track and the State, is distributed after the race to the successful bettors in proportion to their contributions to the various pools." Id. at 944, 945. See also, Longstreth v. Cook, supra, and Smith, C.J., dissenting (discussing the development and history of pari-mutuel wagering at length); and Register v. Oaklawn Jockey Club,Inc., 306 Ark. 318, 811 S.W.2d 315 (1991) (discussing the legality of pari-mutuel wagering).
The exact characteristics of the new activity you describe would have to be analyzed factually to determine their consistency with the concept of "pari-mutuel wagering." Again, as noted above, I simply cannot undertake such a factual analysis in the format of an official Attorney General opinion. The resolution of the ultimate issues you pose, therefore, must be provided by the judicial branch.
Senior Assistant Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:ECW/cyh